JONES, Chief Judge,
delivered the opinion of the court:
These are consolidated actions for refund of Federal income taxes. The primary issue common to both cases involves the corporate reorganization provisions of the Internal Revenue Code of 1939, and their application to a recapitalization of the Phoenix Hosiery Company in the year 1944. As will be hereinafter more fully set out, by the end of 1943 the Phoenix Company was in financial difficulties, being greatly in arrears on the payment of preferred stock dividends and in its obligation to gradually redeem the preferred stock. It was felt necessary to formulate a plan of recapitalization. Out of the method used, the issues in this case arise.
Of the three classes of Phoenix stock outstanding, the taxpayers (Herman Gardner and his wife, Gertrude) owned approximately 13 percent of the common stock, 33 percent of the first preferred, and 93 percent of the second preferred. The plan of recapitalization called for retirement of the publicly held first preferred stock for cash; exchange of the Gardners’ shares of first preferred for long-term debentures; and reduction of the old 7 percent second preferred stock to 5 percent preferred.
*131 The Commissioner of Internal Revenue viewed the transaction involving the first preferred solely as a redemption and determined that the taxpayers had realized long-term capital gains. The exchange of the second preferred stock is not in issue here. The Commissioner rejected the taxpayers’ contention that the transaction involving the first preferred was a tax-free recapitalization-reorganization, that under §§ 112(g) (1) (E) [1] and 112(b)(3)[2] the debentures were “securities in a corporation a party to a reorganization,” “exchanged solely for stock or securities in such corporation,” “in pursuance of the plan of reorganization,” and that therefore no gain is recognized for Federal income tax purposes.
Although § 112(g) states that recapitalization is one form of reorganization, the statute does not tell us what recapitalization means. Nor do the Regulations attempt a clear-cut definition. The Supreme Court has stated, however, that
recapitalization as used in § 112 (g) must draw its meaning from its function in that section. It is one of the forms of reorganization which obtains the privileges afforded by § 112(g). Therefore, “recapitalization” must be construed with reference to the presuppositions and purpose of § 112(g). It was not the purpose of the reorganization provision to exempt from payment of a tax what as a practical matter is realized gain. Normally, a distribution by a corporation, whatever form it takes, is a definite and rather unambiguous event. It furnishes the proper occasion for the determination and taxation of gain. But there are circumstances where a formal distribution, directly or through exchange of securities, represents merely a new form of the previous participation in an enterprise, involving no change of substance in the rights and relations of the interested *132 parties one to another or to the corporate assets. As to these, Congress has said that they are not to be deemed significant occasions for determining taxable gain.
# $ * * $ Congress has not attempted a definition of what is recapitalization and we shall follow its example. The search for relevant meaning is often satisfied not by a futile attempt at abstract definition but by pricking a line through concrete applications.[3]
The defendant has taken two alternative positions. It first contends that all of the first preferred stock — the taxpayers’ as well as the publicly held — was in fact redeemed, thus taking the transaction out of the scope of the reorgani-ation provisions of § 112. It relies on the fact that there was a gap between the taxpayers’ relinquishment of their first preferred stock and their receipt of the debentures. In the alternative, it is contended that, even though the transaction may satisfy the literal language of § 112, it does not satisfy the purpose of the Congress in postponing the tax liability.
In 1939, the entire voting control over the corporation passed from the common stock and vested in the first preferred stockholders because of arrears in dividends on the first preferred stock. The annual dividend requirement on the 7 percent first preferred was $173,082; by the end of 1943, there were dividend arrears of $30.62 per share, for a total of $757,110.12. In addition, as of December 31, 1948, Phoenix was in default, and had been in default for a number of years, in its charter obligation to retire annually 1200 shares of first preferred stock by purchase or redemption at a price not to exceed $115 per share plus dividend arrears.
The second preferred stock, held almost entirely by the Gardners, had an annual dividend requirement of $35,000; by the end of 1943, there were dividend arrears of $84 per share, for a total of $420,000.
Early in 1939, Phoenix’s board of directors appointed a committee to consider the possibility of a recapitalization involving the preferred stock. In addition to the dividend arrears and retirement defaults, the outbreak of World War II brought new financial problems. Postwar equipment *133 changes and improvements were estimated to cost over $2,000,000; new raw material inventories would have to be built to meet the anticipated postwar demands.
There is sufficient evidence in the record to show that it was necessary to strengthen the corporation’s capital and credit, and that the control of the corporation by the first preferred stockholders and the high dividend rate on the first preferred stock was an impediment to financial stability and a source of credit weakness.
Several solutions were considered by the committee. Full cash redemption, using bank loans to provide some of the funds, was regarded as financially unworkable because the company could not stand the expense. Another plan under study called for exchange of all the first preferred stock, share for share, for a new 5 percent preferred, plus some cash and common stock.
The plan finally adopted received its impetus from a proposal made by Herman Gardner. Early in December 1943, he suggested to the committee that the publicly held first preferred stock be redeemed for cash, to be financed for the most part by a bank loan, and that he and Mrs. Gardner would take debentures in exchange for their first preferred stock. In a formal letter to the board of directors of Phoenix the Gardners stated that if Phoenix should call the entire issue of first preferred stock at the charter-prescribed price, they would furnish their irrevocable powers of attorney to the corporation authorizing Phoenix to retain the money otherwise payable to them and to issue to them long-term 5 percent subordinate debentures. The corporation was advised by counsel that a formal redemption of the entire issue of first preferred in cash would minimize the possibility of stockholder suits.
Acting on the Gardners’ commitment, the board of directors approved the plan for redemption of the first preferred stock. The publicly held first preferred were redeemed with the proceeds of a 5-year partly secured bank loan of $1,700,000 at 2% percent interest, in addition to some $750,000 of company funds. The redemption of the Gard-ners’ first preferred was accomplished by a 2-day borrowing of $1,190,896.97. The proceeds of this loan were first de *134 posited in the corporation’s bank account and then delivered by company check to the redemption agent. On that same day, Phoenix, under the irrevocable powers of attorney from the Gardners, also took possession of their shares of first preferred stock. On the next day, Phoenix presented the stock to the redemption agent, together with the irrevocable powers of attorney, received back the $1,190,896.97, deposited this amount in its own checking account, and drew and delivered its check in repayment of the 2-day bank loan. All other first preferred stockholders were paid off in cash by the redemption agents with the other moneys previously furnished by the corporation. Thus, in form, all of the first preferred stock was redeemed in cash.
Subsequently, the 7 percent second preferred stock, held entirely by the Gardners and one corporate officer, was exchanged for new 5 percent preferred; the $425,916.67 arrears on the 7 percent second preferred was eliminated.
It is appropriate at this point to dispose of the defendant’s contention that the formal redemption of the Gardners’ first preferred stock with the proceeds of the 2-day bank loan — which bridged the gap between the relinquishment of the first preferred stock by the Gardners and their subsequent receipt of the debentures — precludes the application of the reorganization provisions of § 112. This argument, it seems to us, places undue emphasis on the “transitory phases” of this arrangement, and fails to view the transaction in its entirety. Helvering v. Limestone Co., 315 U.S. 179 (1942). There is no question that the board of directors adopted the plan to redeem the first preferred with the understanding that the redemption of the Gardners’ first preferred stock was to be only a formality, and that, in actuality, they were to receive, not cash, but debentures. Before the redemption of any of the first preferred stock, the Gardners gave Phoenix, in accordance with their prior commitment letter, the irrevocable powers of attorney. In the circumstances, if the tax consequences here are to “turn on matters of substance rather than technicality or form,” as we think they should (Koppers Co., Inc. v. United States, 133 Ct. Cl. 22 (1955), cert. denied, 353 U.S. 983 (1957)), this transac *135 tion must be treated as an “exchange” of preferred stock for debentures within the meaning of § 112(b) (3).
It is, of course, not enough that the taxpayer satisfies the provisions of § 112 “treated as inert language.” “Unless a transaction is a reorganization contemplated by § 112(g), any exchange of ‘stock or securities’ in connection with such transaction, cannot be ‘in pursuance of the plan of reorganization’ under § 112(b) (3).” Bazley v. Commissioner, 331 U.S. 737, 740, 741 (1947). The “continuity of interest” test is one of the barriers raised to deny the benefits of the reorganization provisions of § 112 to transactions not within the purpose of those provisions. Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462 (1933); LeTulle v. Scofield, 308 U.S. 415 (1940). It is this test which the Government contends the taxpayer has not met in the case at bar.
In the Pinellas case, the Pinellas corporation had transferred its assets to another company, and had received in exchange cash, and three short-term notes, payable over a period of 105 days. As the notes were paid the Pinellas company immediately distributed the proceeds to its stockholders. The issue there was whether the Pinellas company was taxable on the gain realized on the transaction under reorganization provisions of the Bevenue Act of 1926 similar to those found in the 1939 Code. Both statutes provided that the term “reorganization” means “a merger or consolidation.” Fairly obviously, what the Pinellas company had done was to sell its assets:
It would require clear language to lead us to conclude that Congress intended to grant exemption to one who sells property and for the purchase price accepts well-secured, short-term notes * * *, when another who makes a like sale and receives cash certainly would be taxed. * * * In substance the * * * [Pinellas company] sold for the equivalent of cash; the gain must be recognized.[4]
The primary ground for this decision denying exemption was that there was no reorganization, because without a continuity of interest, there was no “merger or consolidation”:
*136 [T]he mere purchase for money of the assets of one Company by another is beyond the evident purpose of the provision, and has no real semblance to a merger or consolidation. Certainly, we think that to be within the exemption the seller must acquire an interest in the affairs of the purchasing company more definite than that incident to ownership of its short-term purchase-money notes.[5]
LeTulle v. Scofield, 308 U.S. 415 (1940), another “merger or consolidation” situation, involved an exchange of stock in one corporation for cash and bonds in another corporation. Holding that this transaction resulted in taxable gain, the Supreme Court made it clear that the term of obligations received in exchange was not material in determining continuity of interest :
[T]he section [defining “reorganization”] is not to be read literally, as denominating the transfer of all the assets of one company for what amounts to a cash consideration given by the other a reorganization. We have held that where the consideration consists of cash and short term notes the transfer does not amount to a reorganization within the true meaning of the statute, but is a sale upon which gain or loss must be reckoned. [Citing the Pinellas case.] * * *
In applying our decision in the Pinellas case the courts have generally held that receipt of long term bonds as distinguished from short term notes constitutes the retention of an interest in the purchasing corporation. * * *
We are of opinion that the term of the obligations is not material. Where the consideration is wholly in the transferee’s bonds, or part cash and part such bonds, we think it cannot be said that the transferor retains any proprietary interest in the enterprise. On the contrary, he becomes a creditor of the transferee * * *.[6]
On the basis of the LeTulle case the Government in the case at bar argues that the reorganization to be exempt must be such that the parties retain their interests in the corporation, and concludes that there is no continuity of interest here since “none of the first preferred stockholders retained any interest in the corporation, by reason of their ownership of the first preferred stock? (Emphasis supplied.)
*137 The court does not believe, however, that the continuity of interest test — which originated in a case construing the words “merger and consolidation” — can be applied automatically to a recapitalization-reorganization situation. Obviously, the test is a means for denying tax benefits to transactions which are outside the intended scope of the reorganization provisions, but are encompassed by the literal language of those provisions; it is not an end in itself. In LeTuTle it was used as a means to prevent the sale of a corporation’s properties for the equivalent of cash from masquerading as a tax-free reorganization. That problem is not present in the case at bar. There are authorities holding that, because of this distinction, it is never applicable to a recapitalization situation. Commissioner v. Neustadt's Trust, 131 F. 2d 528 (2d Cir. 1942); Davis v. Penfield, 205 F. 2d 798 (5th Cir. 1953); Daisy Seide, 18 T.C. 502 (1952).
The Government contends that there can never be a recapitalization where — as in the case at bar — preferred stock is exchanged for debentures, because of a failure of continuity of interest. But it has failed to point to the evil which this blanket application of the test is supposed to prevent. On analysis, we believe the facts show that the recapitalization involved here fully “partakes of those characteristics of a reorganization which underlie the purpose of Congress in postponing the tax liability.” Bazley v. Commissioner, 331 U.S. at 741. In any event, if, in theory, continuity should be required it would seem that here, as in Penfield v. Davis, “the interest of the holders of a preferred stock limited to fixed dividends and par was fairly reflected in the highly equivalent characteristics of the debentures, into which the preferred was converted.” Penfield v. Davis, 105 F. Supp. at 311. Furthermore, the taxpayers in the case at bar not only retained a majority of the common stock, but, as an incident to the redemption of the publicly held preferred stock, corporate control was returned to the common stock. The net effect of the transaction was to increase the taxpayers’ interest in the corporation.
Aside from the issue of applicability of the continuity of interest test, the question remains whether the preferred stock was exchanged for debentures in pursuance of the plan *138 of recapitalization-reorganization. We are convinced that the plan adopted by Phoenix involving the exchange of both classes of preferred stock for “stock or securities” fits the general definition of a “recapitalization” as a “reshuffling of a capital structure within the framework of an existing corporation” (Helvering v. Southwest Consolidated Corp., 315 U.S. 194, 202), and that this recapitalization satisfies the objective of the Congress in exempting “legitimate reorganizations, required in order to strengthen the financial condition of the corporation.” (H.R. Rep. No. 704, 73d Cong., 2d Sess. 14 (1934), relating to similar provisions of the Revenue Act of 1934.) The dividend arrears were eliminated, the interest requirements on the bank loans were lower than the dividend requirements on the retired stock, Phoenix received a substantial tax benefit from the substitution of interest-bearing debentures for the taxpayers’ preferred stock, and the corporate control was returned to the common stock.
The Government, in fact, does not dispute the business advantages to the corporation resulting from the exchange. Nor does it contend that the exchange had the effect of the distribution of a taxable dividend within the meaning of § 112(c). Cf. Wolf Envelope Co., 17 T.C. 471 (1951); Knapp-Monarch Co., 1 T.C. 59 (1942), aff’d, 139 F. 2d 863 (8th Cir. 1944); Skenandoa Rayon Corp. v. Commissioner, 42 B.T.A. 1287 (1940), aff’d, 122 F. 2d 268 (2d Cir. 1941); cert. denied 314 U.S. 696.
We therefore conclude that, since the exchange in issue here satisfies both the literal language and the purpose and objective of the reorganization provisions of § 112, no gain should be recognized.
We turn now to the questions relating solely to No. 298-54, involving 1945 taxes. As to the question involving the loss carry-forward, since we hold that no gain should be recognized on the exchange of the preferred stock for the debentures, the Government concedes that the plaintiffs are entitled to a loss carry-forward to 1945.
The facts relating to the remaining question may be briefly stated; they are spelled out in more detail in the findings of fact. In October 1944, Herman Gardner was presi *139 dent of Phoenix, as well as its controlling stockholder. In that month, Gardner personally granted, as an incentive, written options to key executives and employees of the company to purchase from him stipulated numbers of shares of Phoenix common stock at a price well below current market and below his cost basis.
In the year 1945, the options were exercised by two employees — Mr. Horowitz, the vice president in charge of eastern sales, and Mr. Maclver, vice president and assistant general manager. They purchased from Mr. Gardner 300 shares of common stock at $5 per share. At the time of the purchase the shares were selling on the New York Stock Exchange at $27.50 and $29.68, respectively. Mr. Gardner deducted $6,993, the difference between the market price and the amount he received for the stock. The Commissioner of Internal Bevenue disallowed the deductions.
The plaintiffs contend that the sale of stock by Mr. Gardner to these key employees at a price below its fair market value and below its cost was a deductible expense under §23(a), or, in the alternative, a deductible loss under § 23(e).[7]
There is no dispute here that, despite the substantial common stock holdings of the Gardners, Phoenix and its stockholders were separate taxable entities. This sale to key employees cannot be considered a “trade or business” expense of Mr. Gardner as a stockholder because there is no showing *140 that it was within the “norm of general and accepted business practice.” Deputy v. duPont, 308 U.S. 488 (1940). We are even less convinced that granting stock options to employees is an “ordinary” expense of a business which consisted of being president of the Phoenix corporation.
The same considerations require us to hold that the sale of stock below cost to corporate employees is not an “ordinary,” “non-trade,” or “non-business” expense within the meaning of § 23(a) (2). Low v. Nunan, 154 F. 2d 261 (2d Cir. 1946).
The Government objects to plaintiffs’ alternative claim for a deductible loss under § 23 (e) because the claim for refund did not assert losses under that section of the Code. While it is true that the taxpayer did not present his claim to the Commissioner of Internal Revenue on the theory of a deductible loss, we think that the facts presented in the claim for a deductible expense necessarily formed a full and complete factual basis sufficient to draw the Commissioner’s attention to the claim now made in this court. National Forge & Ordnance Co. v. United States, 139 Ct. Cl. 222 (1957).
As to the merits of plaintiffs’ claim, in view of what has already been said in connection with the claim for a “trade or business” expense, the taxpayer is likewise not entitled to a deduction for a loss incurred in “trade or business” under § 28(e)(1).
The remaining issue is whether the difference between the sale price of the stock and the taxpayer’s cost basis was a loss incurred in a “transaction entered into for profit.” § 23 (e) (2). There can be no doubt that the transaction in question was entered into for profit. The men granted the option by Gardner had all been with the company for a considerable time and they had proven their ability during that time. As the principal stockholder of the corporation— he owned 73 percent of the common stock — Gardner wished to protect his investment by insuring that the corporation would not lose the services of these key employees. Therefore, as an incentive to these men to continue in the service of the business, the taxpayer sold them the stock in question at considerably less than they would have had to pay on the market.
*141 In similar situations, it has been held that such a transaction is entered into for profit. Kress v. Stanton, 196 F. 2d 499 (6th Cir. 1952), affirming 98 F. Supp. 470 (W.D. Penn. 1951). The motivation for the sale by a shareholder of his securities to key employees at a price below market value is quite properly considered to rest on the stockholder’s expectation of increased dividends, i.e. profits, to the stockholder, and in the enhancement of the value of those stocks retained by the stockholder. Hence, the transaction is entered into for profit:
It does not strike me as odd that a portion of the holdings should be sold at a loss in order to obtain an overall profit or financial advantage for the * * * [stockholder] with respect to its remaining holdings. (Kress v. Stanton, 98 F. Supp. at 474.)
A fact pattern almost exactly analogous to this was presented to the Court of Appeals for the Second Circuit in the ease of Scherman v. Helvering, 74 F. 2d 742 (2d Cir. 1985). There, the taxpayer sought to deduct as a loss from his gross income the difference between what the shares originally cost him and the price at which he sold them to his employee. The court, per Judge Learned Hand, concluded that the deduction should be allowed even though the market value of the securities was considerably more than the price which the employee paid to the taxpayer for the shares. We think the Soherman case is controlling here. Cf. Peabody Coal Co. v. United States, 80 Ct. Cl. 202 (1934).
In view of the authorities discussed above, we hold that the action of the Commissioner of Internal Revenue in disallowing the deduction was incorrect.
The plaintiffs in No. 297-54 and No. 298-54 are entitled to recover on the claim arising out of the reorganization in 1944. The plaintiffs in No. 298-54 are entitled to recover on their claim for a loss carry-forward in the year 1945. Finally, as to that portion of the claim in No. 298-54 wherein plaintiffs seek the deduction of a loss, plaintiffs are entitled to recover under § 23 (e) (2). Judgments to this effect will be entered and the amounts of recovery will be determined pursuant to Rule 38(c).
It is so ordered.
*142 Dtjrfee, Judge; Laramore, Judge; Madden, Judge, and Whitaker, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
These cases were consolidated for trial pursuant to stipulation with the approval of the Commissioner. The findings will be grouped into those relating to the claims filed on behalf of each decedent, and those which are common to the claims of both.
FINDINGS RELATED TO NO. 298-54
1. The plaintiffs are duly qualified and acting trustees under the last will and testament of Herman Gardner, deceased, who died on September 3,194T, and hold, as trustees, the claims sued for in this action.
2. Herman Gardner timely filed his Federal income tax returns for the calendar year 1944 with the Collector of Internal Revenue at Milwaukee, Wisconsin, and reported a tax liability of $46,100.62, and paid this amount to the Collector.
3. The Commissioner of Internal Revenue and Herman Gardner in writing on Form 872 extended the period within which the Commissioner could make an assessment of Federal income taxes for the years 1944 to June 30, 1948.
4. Upon examination of the aforesaid tax return, the Commissioner determined that the decedent’s (Herman Gardner) tax liability for said year was $150,957.35, and proposed an additional assessment in the amount of $104,856.73.
5. Thereafter, the Commissioner assessed an additional tax against the decedent for $104,856.73 and interest of $20,447.06 for the year 1944, which said amounts were paid on June 15, 1948.
6. The assessment of the additional taxes was based upon a determination by the Commissioner that Herman Gardner had realized a long-term capital gain of $454,732.80 in connection with a transaction involving 5,846 shares of the first *143 preferred stock of Phoenix Hosiery Company, a Wisconsin corporation, having its principal office in Milwaukee, Wisconsin, which transaction had been reported by the decedent in his 1944 Federal income tax return as a non-taxable transaction.
7. On June 8,1950, the plaintiffs filed a claim for refund, and on June 15, 1950 they filed an amended claim for refund of the additional taxes assessed, together with interest. The claims for refund were rejected by the Commissioner on July 21, 1952.
8. The grounds for refund for 1944 income taxes as set out in the claim as amended were that Herman Gardner had received for 5,846 shares of 7 percent first preferred stock of Phoenix Hosiery 5,846 shares of 20-year 5 percent income debentures of the face amount of $861,525.02 of Phoenix Hosiery Company, that such exchange was part of a recapitalization plan of Phoenix Hosiery which constituted a reorganization within the meaning of Section 112(g) (1) of the Internal Revenue Code of 1939, that the debentures received by decedent for his first preferred stock were securities within the meaning of Section 112(b)(3), and no gain or loss was to be recognized for tax purposes on such exchange under Section 111(c) of the 1939 code. It was urged that the Commissioner erred in his assessment of the additional taxes for the year 1944.
In the alternative, plaintiffs asserted in the amended claim for refund that under the transaction set forth, if it be held that gain is recognized, which claimants deny, claimants contend that the debentures received by the decedent in exchange for his 7 percent first preferred stock did not have a value in excess of 90 percent of the face amount thereof and that the profit to the decedent was accordingly overstated in the amount of $86,152.50, representing the difference between the face value of the debentures received by decedent, i.e., $861,525.02, and 90 percent of such face value.
FINDINGS RELATED TO NO. 297-54
9. The plaintiff, Theodore Friedlander, Jr., is a citizen of the United States and resides in Milwaukee, Wisconsin, and is the duly qualified and acting executor of the last will and *144 testament of Gertrude Gardner, deceased, who died on February 9,1951, and holds the claims sued upon in this action.
10. Gertrude Gardner timely filed her Federal income tax return for the calendar year 1944 in the Office of the Collector of Internal Revenue, Milwaukee, Wisconsin, and reported a tax due of $8,861.44, which amount she paid to the Collector.
11. The Commissioner of Internal Revenue and Gertrude Gardner agreed in writing on Form 872 to extend the period within which the Commissioner could make assessments for Federal income taxes for the calendar years 1944 to June 30,1948.
12. Upon examination of the said return, the Commissioner determined that her tax liability for the year 1944 was $37,129.23, and that there was an additional tax due from Mrs. Gardner in the amount of $28,267.89, and he thereafter made an assessment for this amount, together with interest of $5,512.24 against Gertrude Gardner, which said amounts were paid to the Collector on June 15, 1948.
13. The assessment of the additional tax was based upon a determination by the Commissioner that Gertrude Gardner, deceased, had realized a long-term capital gain of $56,426.15 in connection with a transaction involving 2,235 shares of the first preferred stock of Phoenix Hosiery Company, a Wisconsin corporation, having its principal office in Milwaukee, which said transaction had been reported by Gertrude Gardner in her said income tax return as a nontaxable transaction.
14. On June 8, 1950, Gertrude Gardner filed a claim for refund of $28,267.89 additional taxes assessed, together with interest thereon from March 15, 1945, on the grounds that she had received for 2,235 shares of 7 percent first preferred stock of Phoenix Hosiery 20-year 5 percent income debentures of the face amount of $329,371.95 of Phoenix Hosiery, that such exchange was part of a recapitalization plan of Phoenix Hosiery which constituted a reorganization within the meaning of Section 112(g) (1) of the Internal Revenue Code of 1939, that the debentures received by her for her first preferred stock were securities within the meaning of Section 112(b) (3) of the 1939 code and no gain or loss was to be recognized for tax purposes under Section 11(c) of *145 the 1989 code, and that, therefore, the Commissioner erred in his assessment of the additional taxes for the year 1944.
In the alternative, Gertrude Gardner asserted in her amended claim that if under the transaction set forth it be held that gain is recognized, which claimant denies, claimant contends that the debentures received by her in exchange for her 7 percent first preferred stock did not have a value in excess of 90 percent of the face amount thereof and that the profit to her was accordingly overstated in the amount of $32,937.20 representing the difference between the face value of the debentures received by her, i.e., $329,371.95, and 90 percent of such face value.
FINDINGS RELATED TO BOTH OASES
15. The claims for refund as amended were rejected by the Commissioner of Internal Revenue by letters dated July 21,1952.
16. On December 31, 1943, Phoenix was authorized to issue (a) 45,000 shares of first preferred stock, having a par value of $100 each, and entitled to a 7 percent cumulative dividend, of which 24,726 shares were outstanding; (b) 5,000 shares of second preferred stock, having a par value of $100 each, and entitled to a 7 percent cumulative dividend, of which 5,000 shares were outstanding and (c) 175,000 shares of common stock, having a par value of $5 each, of which 174,300 shares were outstanding. The common stock was listed on the New York Stock Exchange.
17. On December 31,1943, there were arrears in dividends on the outstanding first preferred stock aggregating $30.62 per share, and arrears in dividends on the outstanding second preferred stock aggregating $84 per share, as reported in the Phoenix annual report for 1943.
18. The articles of organization of Phoenix required it to retire annually 1200 shares of first preferred stock by purchase or redemption at a price not to exceed $115 per share plus the dividend arrears thereon; and that at such maximum price, the total annual requirement for stock retirement was $138,000, exclusive of arrears.
19. As of December 31,1943, Phoenix was in default, and had been in default for a number of years in its said obligation to retire first preferred stock.
*146 20. As of December 31, 1943, pursuant to the articles of organization of Phoenix, by reason of the said dividend arrears and retirement defaults, Phoenix was precluded, and had been precluded since before 1939, from paying any dividends on its common stock.
21. As of December 31, 1943, under the articles of organization of Phoenix, by reason of the said dividend arrears the entire voting power was vested, and had been so vested for a number of years, in the holders of the first preferred stock, the common stock being deprived of such voting power; as of December 31,1943, and since at least January 1, 1939, only the votes of the holders of the first preferred stock were solicited, received and counted at all meetings of the stockholders of Phoenix. This caused no change, however, in the makeup of the board of directors.
22. As of December 31, 1943, Herman Gardner was the owner of 5,846 shares of the first preferred stock, which he had acquired at an aggregate cost of $406,792.22, and of 1,393% shares of the second preferred stock; as of said date his wife, Gertrude Gardner, owned 2,235 shares of the first preferred stock which she had acquired at an aggregate cost of $215,923.18, and 3,273% shares of the second preferred stock; as of said date Herman Gardner and Gertrude Gardner owned an aggregate of 128,499 shares of the common stock, being about 73 percent of the shares outstanding.
23. On December 31, 1943, the 16,645 remaining shares of first preferred stock, constituting a large majority of the total of such stock outstanding, was publicly held by more than 365 stockholders situated in various parts of the United States and elsewhere. The remaining shares of common stock, constituting less than 27 percent of the total of such stock outstanding, were publicly held by more than 316 stockholders situated in various parts of the United States and elsewhere.
24. On December 31, 1943, and for many years prior thereto, Herman Gardner was president and chairman of the board of directors of Phoenix. With insignificant exceptions, the public holders of the first preferred stock were not associated with the management or direction of Phoenix.
*147 25. As early as April 21, 1939, the board of directors of Phoenix gave consideration to a recapitalization plan with respect to the preferred stock of the company, and continued to give consideration to such matter at various meetings of the board in the years 1939 through 1943.
26. On July 21,1939, a committee of the board of Phoenix Plosiery was appointed to study and present a plan to effectuate a recapitalization. The committee was composed of the following directors, none of whom were officers or employees of Phoenix: L. A. Lecher, Esq., senior partner of the Milwaukee law firm of Lecher, Michael, Spohn and Best, Esqs., counsel to the company; R. R. Reeder, Jr., an officer of Marine National Exchange Bank of Milwaukee; A. E. Hamill, partner of Goldman, Sachs & Co., investment bankers; and E. B. Kapp, of Lehman Bros., investment bankers. The committee, and the above-named members thereof, continued in office until at least December 27, 1943. No formal meetings of the committee were held; therefore, no minutes were maintained. No formal plan was presented to the board of directors for consideration by the committee. Various proposals in writing were exchanged between committee members, however.
27. The retirement of the first preferred stock of Phoenix Hosiery Company, which took place on March 1, 1944, was based upon Herman Gardner’s proposal.
28. As early as February 9, 1943, Herman Gardner called Lehman Bros, on the telephone and spoke to Mr. S. M. Shotwell. In that discussion he requested that firm to prepare a plan if possible and to submit it to him, whereby the company could reduce the dividend rate on its preferred stock from the existing 7 percent to 5 percent. He stated that the company was able to pay a cash dividend of $15 to $20 per share on the preferred stock on account of the arrears in connection with such a plan. It was then the impression of Mr. Shotwell that Mr. Gardner contemplated a recapitalization of the company to clear up all the arrears on the preferred stock.
29. Many letters were exchanged in which various plans of reorganization were discussed at length. These even included possible sale of the company’s assets to a new company to be formed.
*148 30. On December 24,1948, Herman and Gertrude Gardner sent the following letter to the board of directors of Phoenix Hosiery Company:
The undersigned, Herman Gardner and Gertrude Gardner (Mrs. Herman Gardner), being the owners and holders, respectively, of 5,836 and 2,235 shares of the Preferred Stock of Phoenix Hosiery Company, for the purpose of providing part of the funds necessary to enable Phoenix Hosiery Company to redeem on March 1, 1944, all of its outstanding Preferred Stock, hereby make the following offer to said corporation:
That if the Board of Directors duly adopts a resolution for the redemption, on March 1,1944, of all of the outstanding Preferred Stock of the corporation, at the price, and in the manner provided in the articles of organization of the corporation, as amended, the undersigned will loan to the corporation, for the purpose of so providing part of the funds necessary for redemption, an amount equal to the redemption price of all of the Preferred Stock of said corporation owned by them, respectively, on the redemption date, and agree to execute and deliver to the corporation irrevocable powers of attorney, in form satisfactory to Phoenix Hosiery Company, authorizing the depositary bank, with which the call price is deposited as trustee, to turn over to Phoenix Hosiery Company the redemption price of such Preferred Stock so owned by Herman Gardner and Gertrude Gardner, to constitute loans by Herman Gardner and Gertrude Gardner, respectively, of the respective amounts so payable to them as the redemption price of their Preferred Stock, such loans to be evidenced by debentures of Phoenix Hosiery Company, bearing interest at the rate of 5% per annum, payable quarterly, which debentures shall be subordinated to bank loans, have such maturity date not less than 15 years from the date of issue thereof, and shall contain such other usual and customary terms, conditions, and provisions agreed upon between the undersigned anci Phoenix Hosiery Company.
The undersigned make the foregoing proposal as part of a plan_of recapitalization of Phoenix Hosiery Company which they intend presently to suggest to the corporation.
31. After the receipt of the proposal from Herman and Gertrude Gardner, and on December 27, 1943, the board of directors adopted a resolution providing for the retirement *149 and cancellation of the entire outstanding issue of 7 percent cumulative first preferred stock of Phoenix for $100, the par value of the stock, plus a premium of $15 per share, plus the accumulated 7 percent dividends to the date of redemption, at a total redemption price of $147.37 per share.
32. On December 30,1943, Phoenix Hosiery Company sent the following notice of redemption of preferred stock to all owners and holders thereof:
PLEASE TAKE NOTICE that, pursuant to the provisions of the articles of organization, as amended, of Phoenix Hosiery Company, a corporation duly organized and existing under the laws of the State of Wisconsin, with its principal place of business in the City of Milwaukee, in said state, a resolution was duly adopted by the Board of Directors of said corporation redeeming, on March 1, 1944, the entire issued and outstanding Preferred Stock of said Phoenix Hosiery Company by paying therefor, in cash, the sum of $100, being the par value thereof, plus a premium of $15 per share thereon and a sum equal to 7% per annum on the par value thereof from the date on which dividends on such Preferred Stock became cumulative to the date fixed for such redemption, less the amount of dividends paid thereon, which sum amounts in the aggregate to $32.37, making the total redemption price $147.37 per share.
The redemption of such Preferred Stock will be made in accordance with the articles of organization, as amended, of the corporation. All holders of Preferred Stock of Phoenix Hosiery Company are hereby notified to surrender, on or before March 1,1944, their certificates for such Preferred Stock to The Commercial National Bank and Trust Company of New York, 46 Wall Street, Borough of Manhattan, City of New York, New York, at which place, on March 1, 1944, upon due surrender of such certificates, properly endorsed, payment therefor will be made in cash, at the rate of $147.37 per share (made up as above set forth), to the registered holder thereof named therein.
If any certificate or certificates for such Preferred Stock shall not have been so surrendered on or before March 1, 1944, the dividends thereon shall cease to accrue from and after the date of redemption, so designated, and all rights against the corporation with respect to the preferred stock so called for redemption, including any right to vote or otherwise participate in the determination of any proposed corporate action, shall forthwith after such redemption date cease and deter *150 mine. The holder of any Preferred Stock so redeemed shall not be entitled to receive interest on any money deposited with such trustee, as hereinbefore provided.
All transfers of Preferred Stock of this corporation hereafter made shall be subject to this notice of redemption and the provisions of the articles of organization of the corporation, as amended, relating to the redemption of such Preferred Stock.
Dated at Milwaukee, Wisconsin, this 30th day of December, A.D. 1943.
PHOENIX HOSIERY COMPANY, By HERMAN Gardner, President.
Countersigned by: J. E. Zwisler, Assistant Secretary.
Note : We are advised that The Commercial National Bank and Trust Company of New York, the Trustee for Redemption, has, for the convenience of Preferred Stockholders residing in and near Milwaukee, appointed Marine National Exchange Bank, 625 N. Water Street, Milwaukee, Wisconsin, as its subagent for the redemption of such shares of Preferred Stock as may be surrendered to said Marine National Exchange Bank for payment in accordance with the foregoing notice of redemption.
33. On or about February 17, 1944, Herman Gardner executed and delivered to Phoenix an irrevocable power of attorney in favor of Phoenix reading as follows:
KNOW ADD MEN BY THESE PRESENTS, that I, the undersigned, Herman Gardner, the owner and holder of five thousand eight hundred and forty-six (5,846) shares of the Preferred Stock of Phoenix Hosiery Company, a Wisconsin corporation, which stock has been called for redemption on March 1, 1944, do hereby irrevocably make, constitute, and appoint said PHOENIX HOSIERY COMPANY my true and lawful attorney, for me and in my name, place and stead, to demand and receive certificates for five thousand eight hundred and forty-six (5,846) shares of (first) Preferred Stock of Phoenix Hosiery Company owned by me and standing in my name, to cause said certificates to be endorsed in my name by Theodore Fried-lander, my attorney-in-fact, and to surrender the same for redemption to The Commercial Bank and Trust Company of New York, the Trustee for Redemption of said Preferred Stock of Phoenix Hosiery Company, or to Marine National Exchange Bank of Milwaukee, *151 its subagent for such redemption, and to demand and receive from The Commercial National Bank and Trust Company of New York, as such Trustee, or Marine National Exchange Bank of Milwaukee, as its subagent, on March 1, 1944, all moneys to which I shall be entitled as the redemption price of the said 5,846 shares of Preferred Stock of Phoenix Hosiery Company owned by me, at the redemption price of One hundred forty-seven and 37/100 ($147.37) per share, amounting to Eight hundred sixty-one thousand five hundred twenty-five and 02/100 dollars ($861,525.02), and, in my name, to give effectual receipts, releases, and discharges therefor, and, upon receipt of said redemption price, amounting to $861,525.02, to retain the same as a loan, such loan to be evidenced by debentures of Phoenix Hosiery Company bearing interest at the rate of five per cent (5%) per annum, having a maturity date not less than fifteen (15) years from the date of issue thereof, and containing such other usual and customary terms, conditions, and provisions agreed upon between Phoenix Hosiery Company and the undersigned, and which debentures shall be subordinated to bank loans, aggregating One million seven hundred thousand and no/100 dollars ($1,700,000.00) to be made to the corporation by Continental Illinois National Bank and Trust Company of Chicago, The Commercial National Bank and Trust Company of New York, and Marine National Exchange Bank of Milwaukee, respectively, all as more fully set forth in a letter from me to Phoenix Hosiery Company bearing even date herewith, a copy of which letter is hereto annexed and marked “Exhibit A”; hereby giving and granting unto my said attorney, its officers and agents, full power and authority to do and perform each and every act or thing whatsoever which they shall determine to be requisite and necessary to be done in and about the premises, as fully and to all intents and purposes as I might or could do if personally present, hereby ratifying and confirming all that my said attorney shall lawfully do or cause to be done by virtue hereof; no person dealing with my said attorney, its officers or agents, shall be required to see to the application or disposition of any moneys delivered or turned over to my said attorney, its officers or agents, by reason of the powers herein granted.
This power of attorney is coupled with an interest, and shall not be terminated by my death, but shall continue in full force and effect until all of the above powers therein granted shall have been fully performed.
*152 IN WITNESS WHEREOF, I have hereunto set my hand and seal, this 17th day of February, A.D., 1944 Signed, sealed and delivered in presence of:
Samuel Horowitz Herman Gardner (seal) Frederick Staples HermaN Garddster.
Said power of attorney was accompanied by a letter of transmittal dated February 17, 1944, reading as follows:
I am enclosing herewith irrevocable power of attorney executed by me in accordance with my letter to the Board of Directors of Phoenix Hosiery Company, dated December 24, 1943, authorizing Phoenix Hosiery Company to receive and receipt for, from The Commercial National Bank and Trust Company of New York, Trustee for Redemption of the Preferred Stock of Phoenix Hosiery Company, the sum of $861,525.02, being the full redemption price for my 5,846 shares of First Preferred Stock of Phoenix Hosiery Company. This power of attorney is delivered to Phoenix Hosiery Company and is to be used by it for the purpose of receiving said redemption price for my shares of First Preferred Stock and to retain said moneys as a loan from me to Phoenix Hosiery Company in that amount, such loan to be evidenced by debentures of Phoenix ITosiery Company bearing interest at the rate of 5% per annum, having a maturity date not less than 15 years from the date of issue thereof, and containing such_ other usual and customary terms, conditions, and provisions agreed upon between Phoenix Hosiery Company and me, and which debentures shall be subordinated to bank loans aggregating $1,700,000 made to the corporation by Continental Illinois National Bank and Trust Company of Chicago, The Commercial National Bank and Trust Company of New York, and Marine National Exchange Bank of Milwaukee, in the following amounts set opposite their respective names:

Name of lyanh Amount

Continental Illinois National Bank and Trust Company of Chicago_ $714,000. 00
The Commercial National Bank and Trust Company of New York_ 714,000. 00
Marine National Exchange Bank of Milwaukee_ 272, 000. 00
1,700, 000.00
which loans have been made by said banks to Phoenix Hosiery Company to in part enable Phoenix Hosiery Company to redeem, on March 1, 1944, all of its outstanding First Preferred Stock, pursuant to the provi *153 sions of a written loan agreement entered into between Phoenix Hosiery Company and said banks, and which debentures to be issued to me shall be subordinated to said bank loans in the manner and to the extent provided in said loan agreement between said banks and Phoenix Hosiery Company.
It is understood that if said debentures are not ready for delivery to me in final form on March 1, 1944, Phoenix Hosiery Company is to issue to me temporary evidences of indebtedness to the amount of my said loan, to-wit, the sum of $861,525.02, to be exchanged for said permanent debentures when ready for delivery.
I hereby confirm the statement in my letter to the Board of Directors of December 24,1943, that this loan is part of a plan of recapitalization of Phoenix Hosiery Company which I have been discussing and considering with your corporation, the details of which are now being worked out, and which will include the exchange of the outstanding Second Preferred Stock of Phoenix Hosiery Company for a new proposed issue of Preferred Stock.
Very truly yours,
Herman Gardner.
34. On the same day, Gertrude Gardner executed and delivered a like irrevocable power of attorney in favor of Phoenix except that it pertained to 2,235 shares of first preferred stock and referred to $329,371.95 as the amount to be received by Phoenix for such shares; such power of attorney was accompanied by a letter of transmittal identical to that written by her husband except that it referred to the above number of shares and the above amount of money.
35. On the next day, February 18,1944, a notice of annual stockholders’ meeting was transmitted by Phoenix to its stockholders, which notice advised that the meeting, called for March 7, 1944, would take no action other than to adjourn until May 9, 1944. Said notice stated as the reason for such adjournment the pending redemption of the first preferred stock; that “The Company is now working on a plan of recapitalization (of which the redemption of the (first) Preferred Stock was the first step) which contemplates the conversion of the Second Preferred Stock into either a new preferred stock to be created or into Common Stock,” and that additional time was needed to prepare the necessary proxy statement and proxies relating thereto.
*154 36. On February 21, 1944, Phoenix, by Herman Gardner, President, entered into an agreement with the Continental Illinois National Bank and Trust Company of Chicago, The Commercial National Bank and Trust Company of New York, and Marine National Exchange Bank of Milwaukee, by the terms of which the banks agreed to lend to the company, on February 29, 1944, $1,700,000, payable five years after date at 2y2 percent interest secured by an assignment to the banks of life insurance policies which the company owned, insuring the life of Herman Gardner in the face amount of $1,225,000, having a cash surrender value at December 31, 1943, in excess of $700,000.
To induce the banks to make the loans, Phoenix warranted that it would on March 1,1944 redeem and retire in accordance with its articles of organization all of its outstanding first preferred stock.
Phoenix agreed that until the notes evidencing the loans were reduced to the then cash surrender value of the insurance policies assigned, it would maintain its working capital at not less than $2,000,000. (Working capital being the excess of current assets over current liabilities, except cash surrender value of insurance policies was not to be included in current assets, and notes to the banks outstanding and unpaid were not to be included in liabilities.) Phoenix agreed to obtain from Herman and Gertrude Gardner, and deliver to the banks prior to the making of the loans, an agreement subordinating the indebtedness of the Gardners to that of the banks until the amount of the bank notes outstanding was reduced below the cash value of the insurance policies securing the bank loans.
37. On February 23, 1944, the written agreement of subordination, referred to in the agreement with respect to said bank loan, was entered into between Herman and Gertrude Gardner and Phoenix, such subordination agreement expressly prohibiting all sale or transfer by the Gardners of any instruments evidencing the indebtedness of Phoenix to them during the period of subordination.
38. On February 29,1944, an adjourned quarterly meeting of the Phoenix Hosiery Company was held at the Marine National Exchange Bank of Milwaukee. Theodore Fried-lander presided. The minutes of such meeting, accurately *155 reporting the substance of the meeting, provide in part as follows:
The Board then proceeded to a consideration of the issuance of debentures to Herman Gardner and Gertrude Gardner in accordance with the letters written by them to the Board and to the Company under date of December 24, 1943, and February 17, 1944.
Mr. Lecher presented to the meeting a proposed trust indenture providing for the issuance of 20 year 5% income debentures of Phoenix Hosiery Company, and containing therein the proposed form of such debentures. After consideration and discussion of the terms of the proposed indenture and debentures, it was, by motion duly made, seconded and unanimously carried:
RESOLVED that a trust indenture substantially in the form presented to this meeting, providing for the issuance of 20 year 5% income debentures of this Company, be and the same is hereby approved.
RESOLVED that the officers of the company be and they are hereby authorized and directed, for and on behalf of the Company, to execute and deliver an indenture substantially in the form of that presented to this meeting, and to execute and deliver to the trustee under such indenture the debentures authorized to be issued thereunder.
RESOLVED FURTHER that the officers of the Company be and they are hereby authorized to take all necessary and appropriate steps to comply with the securities law of the State of Wisconsin in connection with the execution of such indenture and the issuance of debentures thereunder.
It was moved, seconded and unanimously earned that, pending printing of said debentures and submission of said trust indenture to the Department of Securities of Wisconsin for its approval and a certificate of exemption in connection with the issuance of said debentures, the proper officers of the Company be authorized and directed to execute and deliver to Mr. and Mrs. Gardner, respectively, memoranda acknowledging that the Company will hold the moneys aggregating $1,190,896.97 to be collected by it from Marine National Exchange Bank of Milwaukee on March 1,1944, as the redemption price of the shares of (first) Preferred Stock held by them, respectively, all pursuant to the powers of attorney to this Company executed by Mr. and Mrs. Gardner, respectively, pending the issue and delivery to Mr. and *156 Mrs. Gardner, respectively, of debentures in accordance with the Company’s agreement with them, respectively, such memoranda to be surrendered to the Company by Mr. and Mrs. Gardner, respectively, upon the delivery to them of such debentures.
It was reported to the meeting that the officers of the Company had arranged with Continental Illinois National Bank and Trust Company of Chicago to borrow from said bank the sum of $1,190,896.97 for two days, to-wit, February 29 and March 1, 1944, to provide the balance of the cash required to be deposited with the Trustee for Eedemption for the redemption of the Company’s outstanding (first) Preferred Stock. Upon motion, made, seconded and unanimously carried, this action of the officers was ratified and confirmed.
Upon motion, the meeting adjourned to Saturday, April 1,1944, at 11 o’clock A.M., at Marine National Exchange Bank of Milwaukee.
(S) T. C. TuRNek,

Acting Secretary.

39. For sometime prior to March 1,1944, Herman Gardner lived in New York City and he would make periodic visits of two to four weeks each to Milwaukee in the fall of the year during which he discussed company affairs with its officers, employees and directors. Although Mr. Gardner was president and chairman of the board of directors, Mr. Theodore Friedlander, his brother-in-law, acted for Mm in his absence. Mr. Friedlander, as directing head of Phoenix, vice president and general manager for many years, also presided at meetings of the board of directors of the firm.
40. The certificates of first preferred stock of Phoenix owned by Herman Gardner, as well as those owned by Gertrude Gardner, were located on or about February 29, 1944, in a safe deposit box in a bank in Milwaukee. Mr. Fried-lander had authority, on behalf of Herman and Gertrude Gardner, to enter the safe deposit box. He did so on or about that date and removed the certificates representing the Gardners’ first preferred shares of stock.
41. On February 25, 1944, Phoenix borrowed $1,700,000 from the three banks mentioned in finding 36 in accordance with the bank loan agreement therein described. These funds were deposited with the first preferred stock redemp *157 tion agent along with $753,000 (rounded figure) of the company’s cash funds.
42. On February 29,1944, Phoenix borrowed for two days $1,190,896.97 from the Continental Illinois National Bank and Trust Company of Chicago. This sum was deposited with the Marine National Exchange Bank of Milwaukee as subagent for the first preferred stock redemption agent.
43. The redemption agent had in hand the entire amount of cash necessary to redeem and retire 24,726 shares of 7 percent first preferred stock of Phoenix.
44. On March 1, 1944, pursuant to the power of attorney (quoted in finding 33), Phoenix delivered the certificates for 5,846 shares owned by Herman Gardner, and 2,235 shares owned by Gertrude Gardner, which had been obtained in the manner described in finding 40, to the Marine National Exchange Bank of Milwaukee for redemption, and demanded and received in cash the redemption price of $861,525.02 for Herman’s shares, and $329,371.95 for Gertrude’s shares at $147.37 per share. This amount was retained by the firm as a loan from the Gardners as evidence of which 20-year 5 percent debentures were thereafter issued to them.
45. On March 1, 1944, upon receipt of the proceeds of the loan from the Gardners, Phoenix repaid the 2-day loan of $1,190,896.97 to the Continental Illinois National Bank and Trust Company.
46. The money received from the $1,700,000 loan (described in finding 41), and $753,000 in cash was paid by the redemption agent to redeem and retire all 7 percent first preferred stock in Phoenix Hosiery Company not owned by the Gardners. This stock was all redeemed at $147.37 per share.
47. On March 2, 1944, Phoenix Hosiery Company, by its treasurer, sent identical letters to both Herman and Gertrude Gardner as follows:
We beg to advise that, pursuant to your power of attorney to our company, dated February 17, 1944, and your letter to us of the same date, we duly deposited with Marine National Exchange Bank of Milwaukee for redemption certificates representing your 5,846 shares of the Preferred Stock of Phoenix Hosiery Com *158 pany, and on March 1 demanded and received from said bank the redemption price therefor amounting to $861,525.02, which we are retaining as a loan from you to be evidenced by twenty year 5% income debentures of our company (subordinated to hank loans of $1,700,000) in the form agreed upon between you and ourselves, subject to the okay of the Department of Securities of Wisconsin. The debentures will be dated March 1, 1944, and will be delivered to you as soon as they are ready.
48. Each action in connection with the redemption of its entire issue of first preferred stock was taken by its officers after authorization by the board of directors and after counsel from attorneys.
49. The cost to Herman Gardner of the 5,846 shares of first preferred stock redeemed was $406,792.22. The cost to Gertrude Gardner of the 2,285 shares of first preferred stock redeemed was $215,923.18.
50. On April 27,1944 notice of the adjourned annual meeting of stockholders of Phoenix, to be held on May 9, 1944, with proxy statement attached, was sent to all stockholders.
51. On May 9,1944 an amendment to the articles of organization of Phoenix was duly adopted, entirely replacing the existing articles by new articles in the form appearing in Exhibit A of the proxy statement.
52. On or about March 16, 1944, the 1,393% shares of 7 percent cumulative second preferred stock owned by Herman Gardner, and the 3,272% shares of such stock owned by his wife, Gertrude Gardner, were delivered by them to Phoenix; and on or about May 31, 1944, Herman Gardner, and his said wife received from Phoenix, respectively, a like number of shares of new 5 percent preferred stock of Phoenix.
53. The remaining shares outstanding of said 7 percent cumulative second preferred stock were delivered to Phoenix by Theodore Friedlander, the holder thereof, and an identical number of shares of new 5 percent preferred stock of Phoenix received by such stockholder from Phoenix.
54. On or about March 16, 1944 the entire issue of said 7 percent cumulative second preferred stock was retired and cancelled by Phoenix.
*159 55. The plaintiffs contend that the transactions which resulted in the retirement of the first preferred stock of Phoenix held by the Gardners constituted an exchange of stock for securities and that such exchange was a tax-free exchange. Alternately the plaintiffs contend that if such exchange was not tax free, any gain to the Gardners was limited to the difference between their cost basis of the first preferred stock and the fair market value as of March 1, 1944 of the debentures which they say were received in exchange.
56. Upon the retirement of the entire first preferred stock issue of Phoenix on March 1, 1944, the voting power in governing the affairs of that company was returned to the holders of its common stock. Before and after this event the Gardners were the owners of 73 percent of the outstanding common stock shares.
57. The debentures which the Gardners received as evidence of their loan to the Phoenix Hosiery Company on or about March 1,1944, were unique in that such debentures were issued to no one else. They could not be traded on any exchange. By the terms of the agreement of subordination between the Gardners and Phoenix of February 17,1944, the Gardners agreed that neither would sell or transfer the debentures until the loans to the banks were paid at least down to the amount of the cash value of insurance policies given as collateral for the bank loans by the company.
58. The bank loans to Phoenix, totaling $1,700,000, were paid off in about 1946.
59. In 1948, after the death of Herman Gardner, the debentures to the Gardners were redeemed by the Phoenix Hosiery Company at full value. This took place 16 years prior to maturity.
FINDINGS RELATED TO NO. 298-54 INVOLVING 1945 RETURN
60. Herman Gardner timely filed his Federal income tax return for the calendar year 1945 with the Collector of Internal Bevenue in Milwaukee, Wisconsin, reporting a tax liability of $80,253.73 which amount was paid to the Collector. In the 1945 return Herman Gardner took a loss carry forward from the years 1942 and 1943 for claimed *160 losses sustained in those years, in the amount of $13,799.41.
61. Herman Gardner’s Federal income tax return for 1944 reported a net capital gain of $2,748.92 and a net capital loss carry over from 1942 and 1943 of $17,548.33. Of this loss carry forward $2,748.92 was offset against the capital gain and $1,000 was deducted on the return, leaving a balance of $13,799.41 to be carried forward to 1945.
62. The Commissioner of Internal Revenue denied the loss deduction taken in the 1945 return because under his determination of the 1944 issue involved in this case, Herman Gardner did not sustain a loss in 1944 and there was no loss to be carried forward from 1944. An additional tax of $13,032.11 was assessed and paid by plaintiffs with interest on April 11, 1949. Except for the determination by the Commissioner that Herman Gardner had realized a long term gain in 1944, by reason of the transaction with respect to his shares of 7 percent (first) cumulative preferred stock of Phoenix, Herman Gardner had a capital loss carry over applicable to the year 1945 in the amount of $13,799.41.
63. In his 1945 income tax return Herman Gardner took an expense deduction of $6,993 which sum was the difference between the market price per share of 300 shares of common stock of Phoenix and $5 per share received by Herman Gardner from Messrs. Maclver and Horowitz in 1945 upon their purchase of said stock under the incentive option granted by Gardner.
64. The additional taxes assessed for 1945 and paid by plaintiffs were based in part upon the Commissioner’s refusal to allow the deduction of $6,993 as an expense. The Commissioner deducted a reported capital gain on the transaction, however, in his computation, holding that as to Herman Gardner there was no gain or loss by the transaction.
65. A claim for refund of $12,110.01 was timely filed on November 21, 1950 with the Collector of Internal Revenue by the plaintiffs on the grounds that the Commissioner erred in disallowing the loss carry over from 1944 and the amount of $6,993 as an expense deduction under Section 23 (a) (1) (A) or under Section 23(a)(2) of the 1939 Internal Revenue Code.
*161 66. This claim is based upon the grounds set out in the claim for refund as found hi the preceding finding. However, the plaintiffs in their petition assert a further alternative, if under the stock option transaction the plaintiffs are not entitled to a deduction of the entire $6,998, they are entitled to deduct as an ordinary loss under Section 23 (e) of the 1939 Internal Revenue Code, at least $2,100 which is the difference between the cost of the 300 shares of Phoenix stock sold, pursuant to the option, which was $3,600 and $1,500 the price received by Herman Gardner. This alternative claim was not asserted in the claim for refund.
67. The claim for refund was denied on June 30,1954 and the petition was filed in this court on July 16, 1954.
68. In October 1944, Herman Gardner was president of Phoenix, having occupied that office since the incorporation of the company in 1893.
69. In October 1944, Herman Gardner was the controlling stockholder of Phoenix, his stockholdings comprising the following percentages of the three classes of its stock then outstanding: 72 percent of the 20-year 5 percent income debentures, 29 percent of the 5 percent cumulative preferred stock and 71 percent of the common stock; that his wife, Gertrude Gardner, was then the holder of the remainder of such debentures, 68 percent of the said preferred stock and 3 percent of the common stock.
70. In October 1944, 174,300 shares of common stock of Phoenix had been issued and were outstanding of which Phoenix owned none and Phoenix was not in arrears with respect to any interest or dividend obligations.
71. In October 1944, and for a number of years prior thereto, Phoenix had no pension, profit-sharing or retirement plan in effect for its management personnel, nor had it given any stock purchase options to such personnel.
72. In October 1944, Herman Gardner personally granted written options to the following key executives and employees of Phoenix for the purchase of stipulated numbers of shares of the common stock of Phoenix then owned by Herman Gardner:

*162
Name Length Position of service

R. E. Browns_ O. Erickson_ R. Frost_ R. Jaeger_ I. Kohlwey-J. Kressbach_ Vice President in charge of Merchandising _ 24 Seamless Knitting Supt- 44 Master Designer- 6 Purchasing Agent- 30 Finishing Superintendent- 28 Administrative Sales Mgr- 29
F. Ladwig_ Assistant full fashioned knitting superintendent _ 16
H. Ludwig_ W. Moehrig_ A. Olson_ L. Stark_ T. Turner_ Full fashioned kniting supt- 10 Office Manager_ 32 Dyemaster- 10 Chief Engineer_ 13 Treasurer- 24
J. Wickert_ J. E. Zwisler_ S. Horowitz_ Throwing department supt- 32 Controller and Secretary- 9 Yice President in charge of Eastern sales division_ 32
F. D. Maclver__ Vice President and Assistant General Manager_ 26
In tbe case of all but the last two executives, the options were exercisable three years later, at a price of $5 per share for the stipulated amounts, which varied from 50 to 200 shares. Mr. Horowitz’s agreement, dated October 31,1944, entitled him to purchase from Herman Gardner a total of 500 shares at $5 per share in blocks of 100 shares during a specified period each year for five years, commencing in October 1945. Mr. Maclver had a like option, dated October 24, 1944, covering 1,000 shares, exercisable in blocks of 200 shares.
73. On October 24, and October 31,1944, the dates of execution of said option agreements, the market prices of the common stock of Phoenix were, respectively, $13 and $12.625 per share.
74. On November 29, 1945, F. D. Maclver exercised his stock option to acquire 200 shares of common stock of Phoenix from Herman Gardner at the option price of $5 per share, the market price then being $27.50 per share; and on November 30,1945, S. Horowitz exercised his stock option to acquire 100 shares of common stock of Phoenix from Herman Gardner at the option price of $5 per share, the market price then being $29.68 per share.
*163 75. F. D. Maclver included the sum of $4,525, being the difference between the market price of $27.50 per share and the option price of $5 per share, as additional income in his 1945 Federal income tax return and paid the tax thereon. S. Horowitz included the sum of $2,468.75, being the difference between the market price of $29.68 per share and the option price of $5 per share, as additional income in his 1945 Federal income tax return, and paid the tax thereon. No part of said taxes so paid has been refunded to said taxpayers.
76. The cost to Herman Gardner of the 300 shares of common stock of Phoenix acquired by Messrs. Maclver and Horowitz in 1945 by exercise of their options at $5 per share as aforesaid was $12 per share.
77. No part of the amounts for which refunds have been claimed, both as to taxes paid respecting the year 1944 and the year 1945, and interest thereon has been repaid by defendant to plaintiffs or to anyone on their behalf.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgments herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, and judgments are entered to that effect with the amounts of recovery to be determined pursuant to Rule 38 (c).
In accordance with the opinion of the court and on memorandum reports of the commissioner as to the amounts due thereunder, it was ordered on March 10,1961, that judgment be entered for plaintiffs in No. 298-54 in the sum of $125,303.79, as overpayments of 1944 tax with interest to date of payment, June 15, 1948, and $10,465.56, as overpayment of 1945 tax with interest to date of payment, April 15, 1949, together with interest on the respective amounts as provided by law; and that judgment be entered for the plaintiff in No. 297-54 in the sum of $33,780.13, together with interest as provided by law.

 “§ 112. Recognition of gain or loss—
“(g) Definition of reorganization.
“As used in this section * * *—
“(1) The term‘reorganization’means * * * (E) a recapitalization, * *

 “§ 112. Recognition of gain or loss—
* * * * ♦ “(b) Exchanges solely in hind—
* # * * * “(3) Stock for Btock on reorganization.
“No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.”

 Baxley v. Commissioner, 331 U.S. 737, 740, 741 (1947).

 287 U.S. at 469.

 287 U.S. at 470.

 308 U.S. at 420—421.

 “§ 23. Deductions from gross income.
“In computing net income there shall be allowed as deductions:
“(a) Expenses.
“(1) Trade or business expenses.
“(A) In General.
“All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *.
“(2) Non-trade or non-business expenses.
“In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.
*****
“(e) Losses by individuals.
“In the ease of an individual, losses sustained during the taxable ear and not compensated for by insurance or otherwise—
“(1) if incurred in trade or business; or
“(2) if incurred in any transaction entered into for profit, though not connected with the trade or business: * * *”